# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **CITY OF OMAHA, NEBRASKA,** a Municipal Corporation, | ) ) ) | CASE NO. 8:07CV157 |
| Plaintiff, | ) ) | **MEMORANDUM AND ORDER ON MOTIONS** |
| v. | ) ) | **FOR SUMMARY JUDGMENT** |
| **FIGG BRIDGE ENGINEERS, INC.,** | ) ) ) | |
| Defendant. | ) | |

This matter is before the Court on the Motion for Summary Judgment (Filing No. 92) filed by Defendant Figg Bridge Engineers, Inc. ("Figg"), and the Motion for Summary Judgment (Filing No. 106) filed by Plaintiff City of Omaha, Nebraska ("City"). Oral argument had been scheduled for January 26, 2009. On January 16, 2009, however, Figg filed an unopposed motion for continuance (Filing No. 120), noting that it wanted to take certain depositions to counter factual issues raised in the City's Reply Brief (Filing No. 119). Because the Court is not inclined to grant the full relief requested in either party's motion for summary judgment, and because some guidance from the Court is likely to be helpful as the parties proceed with further discovery as permitted herein, this Memorandum and Order is issued, disposing of the three pending motions.

## PROCEDURAL AND FACTUAL BACKGROUND

Early in 2002, the City entered into an Engineering Agreement with Figg, a Florida corporation, for the design of a pedestrian bridge across the Missouri River. (Filing No. 61-2, herein the "Agreement"). Figg acknowledges that it holds itself out to the general public, including the City, as a professional design firm having certain experience and expertise in the design of bridges, and that it had a professional duty to the City to exercise the skill,

care, and diligence of like professionals under similar circumstances and in a non-negligent manner. (Answer to Amended Complaint, Filing No. 66, ¶ 13-14).

The City contends that Figg knew the City's budget for the bridge was $22.6 million, and, throughout the design process, Figg assured the City that the bridge could be built within that budget. When bids for the bridge project were opened on March 5, 2004, however, the bids far exceeded the City's budget. The City terminated the Agreement on October 26, 2005, and demanded return of over $3 million paid to Figg. (Amended Complaint, Filing No. 61, ¶¶ 8, 10, 12, 14).

The City brought this action on March 30, 2007, in the Douglas County, Nebraska, District Court, and Figg removed the action to this Court on April 26, 2007, invoking the Court's diversity jurisdiction. (Filing No. 1). The City's Amended Complaint raises six claims: breach of written contract, breach of oral contract, negligent misrepresentation, professional negligence, breach of good faith and fair dealing, and unjust enrichment. (Amended Complaint at ¶¶ 15-49). The City seeks restitution, compensatory damages, and other relief. (*Id.* at p. 7).

Figg earlier moved for summary judgment on all claims except professional negligence, alleging that under Nebraska law all the City's other claims are subsumed in the claim for professional negligence. This Court granted the motion in part, recognizing that the City has one cause of action against Figg that is governed by Nebraska's two-year statute of limitations for professional negligence, but noting that the City could proceed against Figg on its six theories of recovery. (Memorandum and Order at Filing No. 88).

Figg now moves for summary judgment alleging that the City sustained no damage because the funds it expended were grants or gifts from the federal government, the states

2

of Iowa and Nebraska, and a Natural Resources District. Figg's index of evidence (Filing No. 94) consists exclusively of documents to support this contention. In the alternative, Figg suggests that summary judgment should be granted in its favor because the Agreement was unambiguous and completely integrated, and it made no mention of Figg's alleged obligation to design the bridge to be built within any cost limit.

The City also moves for summary judgment, contending that the uncontroverted facts demonstrate that Figg agreed orally and in writing to design the bridge to be built within the City's budget, and instead designed a bridge costing more than twice that sum.

Evidence before the Court on the pending motions for summary judgment includes the Agreement, containing no reference to the City's budget limitation. With all attachments and amendments, the Agreement is 130 pages long, single-spaced. The first document within the Agreement, executed by the parties in early 2002, included the following provisions:

> VII.  CHANGE OF PLAN, ABANDONMENT, SUSPENSION, AND TERMINATION
> . . . .
> The City can abandon the project or change the general scope of work at any time, and such action on its part shall in no event be deemed a breach of agreement. . . . .
> If the City abandons or subtracts from the work, or suspends or terminates the agreement as presently outlined, the Consultant will be compensated in accordance with 48 CFR Part 31, provided however, that in case of suspension, abandonment, or termination for breach of this agreement or for improper work, the City can suspend payments, pending the Consultant's compliance with the provisions of this agreement. . . . .

Agreement, CM/ECF p. 7.

> XXV. ALL ENCOMPASSED
>
> This instrument embodies the whole agreement of the parties. There are no promises, terms, conditions, or obligations other than contained

> herein, and this agreement supersedes all previous communications, representations, or other agreements or contracts, either oral or written hereto.

Agreement, CM/ECF p. 15.

The Agreement makes reference to Figg's responsibility to deliver preliminary construction cost estimates, to prepare conceptual level construction cost estimates, and to compute preliminary cost estimates at the first phase of the project. (*Id.*, CM/ECF pp. 23, 25). It also makes reference to Figg's responsibility to prepare cost estimates at the third phase of the project.[1] (*Id.* at CM/ECF p. 119).

Also among the evidence before the Court is the affidavit of Larry N. Foster, a former employee of the City, who worked as its Director of Parks from January 1, 2000, through July 25, 2008. (Filing No. 108-3, "Foster Aff." ¶¶ 1, 4). Foster states that he repeatedly reminded Figg of the City's $17 million[2] construction budget throughout the City's relationship with Figg. (*Id.* at ¶ 10). Foster states that, before the Agreement was executed, Figg representatives told him they would design the bridge within the City's $17 million budget, and, after the Agreement was executed, Figg representatives assured him that they were working to design the bridge within the $17 million cost limitation.[3] (*Id.* at

---

[1] Specifically, the Phase III - Final Design Services section of the Agreement required cost estimates with "the 60% plans" and "at the 90% and final stages." *See* Agreement, CM/ECF p. 119.

[2] The Court infers that the difference in the City's $22.6 million figure in the Amended Complaint and the $17 million figure in Foster's Affidavit is the estimated design cost. See Filing No. 108-11, p. 3, Figg's "Construction Options for Cost Reduction," dated February 18, 2003, noting a budget of $22,613,400 and a "Planning/Engineering/CEI" element of $5,737,000. See also Plaintiff's Reply Brief, Filing No. 119, p. 2.

[3] The evidentiary record before the Court also includes copies of a variety of e-mail communications, indicating that representatives of the City and Figg discussed concerns

4

¶¶ 11-15). Figg's final design plan had three alternatives, with slight variations, and Figg's cost estimates for these three designs ranged from $16,800,000 to $17,690,000. (*Id.* at ¶ 15). When Figg's design was let out for bids, however, the two construction bids received were $44,942,031 and $50,286,497.90. (*Id.* at ¶ 16).

The City did not build the bridge designed by Figg, and instead built a bridge designed by another company. (*Id.* at ¶ 17). Figg cashed checks from the City in the total amount of $3,711,200.77. (*Id.* at ¶ 7).

## STANDARD OF REVIEW

Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Cordry v. Vanderbilt Mortgage & Fin., Inc.*, 445 F.3d 1106, 1109 (8th Cir. 2006) (quoting *Bockelman v. MCI Worldcom, Inc.*, 403 F.3d 528, 531 (8th Cir. 2005)). The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The proponent need not, however, negate the opponent's claims or defenses. *Id.* at 324–25.

---

about the City's budget and concerns that the cost of construction of the bridge designed by Figg exceeded that budget, necessitating re-design. *See* Affidavit of Anne Marie O'Brien, Filing No. 108-17, and attachments.

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts." *Id.* at 586.

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). "If the evidence is merely colorable or is not significantly probative summary judgment may be granted." *Id.* at 249–50 (citations omitted).

Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327.

## DISCUSSION

"'Federal district courts sitting in diversity . . . must apply the forum state's substantive law . . . .'" *PHL Variable Ins. Co. v. Fulbright McNeill, Inc.*, 519 F.3d 825, 828 (8th Cir. 2008), (quoting *Guardian Fiberglass, Inc. v. Whit Davis Lumber Co.*, 509 F.3d 512, 515 (8th Cir. 2007)). Both the City and Figg acknowledge that Nebraska substantive law applies in this case.

Engineering firms are professionals that may be sued for professional negligence or for breach of warranty in rendering or failing to render professional services. *See Board of Regents v. Wilscam Mullins Birge, Inc.*, 433 N.W.2d 478, 483 (Neb. 1988); *Georgetowne*

*Ltd. P'ship v. Geotechnical Servs. Inc.*, 430 N.W.2d 34, 38 (Neb. 1988); *Lindsay Mfg. Co. v. Universal Sur. Co.*, 519 N.W.2d 530, 538 (Neb. 1994).

The Nebraska Supreme Court has acknowledged that in the context of actions by clients against professionals whose services have been retained, "the dividing line between breaches of contracts and torts is often dim and uncertain," and that a negligent failure to perform contractual duties with "care, skill, reasonable expediency, and faithfulness . . . is a tort as well as a breach of contract." *Lincoln Grain, Inc. v. Coopers & Lybrand*, 345 N.W.2d 300, 304-05 (Neb. 1984). In *Lincoln Grain*, the court deferred to the parties' election to try the case "as if it were one in tort." *Id*. at 305. It can be inferred from *Lincoln Grain* that the plaintiff could have proceeded against the professional accounting firm under a contract theory. As noted above, this Court has already ruled that the City has one cause of action against Figg, presenting six different theories of recovery.

### ***Should the City's Action Be Dismissed Because the City Sustained No Damages?***

Figg contends that the City's action must be dismissed because the uncontroverted facts demonstrate that the City sustained no damages. In support of this theory, Figg has produced a Funding Status Report that lists the source of funds the City received for use on the bridge project. (Filing No. 94, Ex. 3-A). The Report shows that the original $22,644,400 allocated for the bridge came from federal sources and from the states of Nebraska and Iowa, as well as the Papio-Missouri River Natural Resources District. Later funding in 2006, 2007, and 2008 came from a variety of sources, including foundations and private donors.

Figg cites no authority for the proposition that a governmental subdivision is precluded from making a claim for damages if the money it lost originated from a source

other than the city's own taxing power, or was designated for a specific project and was never placed in its general fund.[4]

Regardless of how the City received funds for the bridge project, it was the City that entered into the Agreement with Figg and the City became Figg's client. The City made payments to Figg under the Agreement. Whether the City obtained the money from its own taxing power, or through grants, or gifts, is of no concern to Figg.

### *Should the City's Breach-of-Contract Claims Be Dismissed Because the Agreement Did Not Require that Figg Design the Bridge to be Built within a Fixed Budget?*

Figg argues that the Agreement was unambiguous, completely integrated, and contained no reference to the City's budget limitation. Figg notes that the parties negotiated four supplemental written agreements through the course of the project,[5] and none of the supplemental agreements contained any reference to a cost limitation. Figg contends, therefore, that the City cannot offer extrinsic or parol evidence to further supplement the terms of the written Agreement, and the City's breach-of-contract claims should be dismissed as a matter of law.

---

[4]Figg notes that "[t]he collateral source rule is understood in Nebraska to preclude the reduction in damages owed to an injured party by a wrongdoer despite indemnification of the injured party through independent or 'collateral' sources." (Figg's Brief, Filing No. 93, p.4, citing *Wolfe v. Gilmour Mfg. Co.*, 143 F.3d 1122 (8th Cir. 1998)). While it is true, as Figg argues, that the collateral source rule is inapplicable to the case at hand, the inapplicability of the rule does not mean that the City sustained no damages.

[5]The supplemental agreements are included within the Agreement, Filing No. 61-2.

The City's arguments in support of its breach-of-contract claims are myriad.[6] While it appears to acknowledge that the Agreement is integrated,[7] the City asserts that the integration clause is applicable only to preclude contract actions based on *previous* communications, representations or other agreements or contracts, either oral or written, and not *subsequent* written or oral agreements. With respect to written agreements, however, the City has not pled the existence of any subsequent written agreement that would support its claim that Figg breached a written contract with the City. The City's First Claim for Relief, based on breach of written contract, refers to the Agreement, attached to and incorporated in the Amended Complaint, which contains *no* budget limitation and *no* express or implied duty on the part of Figg to design the bridge below any cost ceiling.

With respect to oral agreements, the City's Second Claim for Relief contains only conclusory allegations. The City's evidence of an oral agreement consists of the Foster affidavit. Foster states that he "told Figg at the beginning of our relationship that the construction budget for the [bridge] was $17,000,000." (Foster Aff. ¶ 10). He alleges that Figg representatives told him "that Figg would design the [bridge] within Omaha's budget of $17,000,000 when they made their initial presentation to the City of Omaha in order to

---

[6] For example, the City notes that it passed an ordinance in 2000 approving an interlocal agreement with "the City of Council Bluffs and the Papio-Missouri River Natural Resources District for the development, design, construction, funding, operation and maintenance of a trail crossing bridge over the Missouri River," noting that "funding would be secured for the project in the approximate amount of $15,000,000." (City's Brief, Filing No. 107, p.23). The City suggests that its approval of the interlocal agreement constituted a "law" that must be incorporated by reference into the Agreement with Figg. The Court finds this argument unavailing.

[7] See, *e.g.,* Plaintiff's Reply Brief, Filing No. 119, p.2-3. The City "simply expected Figg to . . . design a bridge and prepare accurate cost estimates that would allow Omaha to make informed decisions on what it could afford to build." *Id.* at 3.

9

get the design project." *(Id.* at ¶ 11). Foster states that he understood the Agreement as vesting him with the authority to direct the scope of Figg's services,[8] and he "did that," reminding Figg on many occasions to be mindful of the City's $17 million budget. (*Id.* at ¶¶ 10-15).

"When parties reduce an agreement to a writing, which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression." *Anderzhon/Architects, Inc. v. 57 Oxbow II P'ship*, 553 N.W.2d 157, 161 (Neb. 1996) (citing *Leo A. Daly Co. v. Omaha-Douglas Pub. Bldg. Comm.*, 324 N.W.2d 252 (Neb. 1982)). "The court, not the jury, decides as a preliminary matter the extent to which the transaction is embodied in the writing, that is, the question of integration." *Traudt v. Nebraska Pub. Power Dist.*, 251 N.W.2d 148, 151 (Neb. 1977). "When the parties have executed a completely integrated written document purporting to express the terms of their agreement, the parol evidence rule renders ineffective any evidence of a prior or contemporaneous oral agreement which adds to, alters, varies, or contradicts the terms of the written document." *Rowe v. Allely,* 507 N.W.2d 293, 296 (Neb. 1993).

---

[8] Foster relies on paragraph XII. of the Agreement which provides: "Any dispute concerning a question of fact in connection with the work, not disposed of by the agreement, will be referred for determination to the Director of Parks, Recreation and Public Property or his duly authorized representative, whose decision in the matter will be final and conclusive on the parties to this agreement." The Court does not interpret this language as giving Foster license to alter or supplement the contractual terms of the Agreement.

The 130-page Agreement in this case appears to be a complete agreement, constituting the final expression of the intent of the parties.[9]  While the City's $17 million budget might be considered an additional term not inconsistent with the Agreement, parol evidence of that term should not be admitted to explain or supplement the Agreement unless the term was made for separate consideration, or it was a term that might naturally be made as a separate agreement by the parties.  *See* Restatement (Second) of Contracts § 213(2)(1981); *Rowe,* 507 N.W.2d at 296*; Lincoln Benefit Life Co. v. Edwards*, 45 F.Supp.2d 722, 743 (D. Neb. 1999).  This Court finds no support for either such exception in this case.  Accordingly, extrinsic or parol evidence of prior or contemporaneous agreements will not be permitted to supplement to terms of the written Agreement.  In other words, the Court will not permit the City to introduce evidence of communications with Figg taking place on or before February 8, 2002, the last date the initial part of the Agreement was signed.  The Court will permit evidence of subsequent oral and written communications offered to demonstrate the creation of a new agreement, or to demonstrate the City's exercise of its right to "change the general scope of work" pursuant to paragraph VII of the Agreement.

Although extrinsic and parol evidence of prior and contemporaneous agreements will not be allowed to supplement the Agreement, genuine issues of fact remain for trial with respect to the City's claim that Figg breached the written Agreement, because the

---

[9] This Court has considered the three tests recommended by the Nebraska Supreme Court, *i.e.*, whether the writing appears to be complete on its face; whether evidence outside the writing contradicts its written terms; and whether circumstances indicate that the parties intended the writing to cover the whole transaction.  *Rowe,* 507 N.W.2d at 296.

Agreement required Figg to provide certain cost estimates, reasonably projecting the cost of construction.

> [A]n architect or engineer may breach his contract for architectural services by underestimating the construction costs of a proposed structure. The rule to be applied is that the cost of construction must reasonably approach that stated in the estimate unless the owner orders changes which increase the cost of construction. It is ordinarily for a jury to say whether the actual cost is within a reasonable range of the estimated costs unless, as here, the excess is so great that the court can deal with it as a matter of law.

*Durand Assocs., Inc v. Guardian Inv. Co.*, 183 N.W.2d 246, 251 (Neb. 1971). *Durand* governs only those situations when the architect has agreed to design a project with a specified budget, *or when the architect is obligated to furnish an estimate of construction costs*.

> "An architect employed to prepare plans and specifications for a building, with the understanding that the construction would be accomplished within certain cost limitations, cannot recover compensation for [architectural] services when the building cannot be erected except at a cost materially in excess of the amount specified." *Kleinschmidt, Brassette & Assocs. v. Ayres*, 368 So.2d 1153, 1155 (La. Ct. App. 1979). [Further citations omitted]
> . . . .
> However, when an architect has no express contractual obligation to design a structure within a specified budget *or to estimate the construction cost* of a proposed project, construction at a cost greater than anticipated by or acceptable to the owner is no defense to an architect's action to recover a fee.

*Getzschman v. Miller Chem. Co., Inc.,* 443 N.W.2d 260, 270 (Neb. 1989)(emphasis added).

The Agreement in this case did require Figg to prepare and deliver certain cost estimates. The Foster Affidavit states that Figg's final cost estimates ranged from $16,800,000 to $17,900,000, while the only bids for construction of the design were $44,942,031 and $50,386, 497.90. (Foster Aff. ¶¶ 15, 16). Accordingly, the City has met its burden at this stage of the proceedings of coming forward with specific facts showing

that there is a genuine issue for trial on its First Claim for Relief, alleged breach of written contract, based on the faulty estimates.

### *Is Summary Judgment in Favor of the City Warranted as a Matter of Law?*

The City argues that Figg breached the Agreement and was negligent as a matter of law, warranting the entry of summary judgment in the City's favor. In support of these arguments, the City points to the Nebraska Supreme Court's holding in *Durand*, where the low bid for a project exceeded the professional engineer's estimated cost by 72 percent, leading the court to conclude that the "excess is so great that the court can deal with it as a matter of law." *Durand*, 183 N.W.2d at 251. Because the lowest bid for the bridge construction exceeded Figg's highest estimate by over 200 percent, the City contends that it is entitled to judgment as a matter of law on its written contract and negligence claims.

While the holdings in *Durand* are instructive, the facts underlying those holdings are different from the facts in this case in several respects. In *Durand*, the written contract was prepared by the defendant architectural firm and strictly construed against it. The client had a specific budget for the construction project and insisted on the insertion of the dollar figure in the written agreement, which the firm did, describing the figure as a "construction cost estimate." *Id.* at 249. Because the written agreement contained the specific construction cost estimate, it can be inferred that the client relied on the firm to design the project to be built at a cost within or close to that estimate.

While the Agreement in this case required Figg to produce cost estimates at more than one stage of the design process, the Agreement did not place any limitation on the cost of the project. The fact that the bids exceeded Figg's final estimates by more than 200 percent do reflect on Figg's professional competence in the field of estimating building

costs, and the Court finds as a matter of law that Figg was negligent in the calculation of the final project estimates. It does not necessarily follow, however, that the City relied on those faulty estimates or was damaged by them. A reasonable interpretation of the holdings in *Durand* and *Getzschman* is that an architect or engineer is not entitled to recover a fee when the construction cost of a proposed project is materially in excess of the amount specified in the contract, nor is the architect or engineer entitled to recover fees for services rendered on a project after the architect or engineer estimates the construction cost, if the actual construction cost materially exceeds the estimate. If a client has not specified a construction budget, then the day the client receives the professional's cost estimate is the day the client begins to rely on that estimate when incurring further fees. From the record before the Court at this time, it appears that Figg's final cost estimates, which so substantially underestimated the construction costs, were presented to the City at "the end" of Figg's performance under the Agreement. (Foster Aff. ¶ 15).

## CONCLUSION

The City's claims against Figg will not be dismissed due to the fact that the City's funds for the bridge originated with third parties. The Agreement between the City and Figg is integrated, and the City will not be permitted to offer extrinsic or parol evidence of prior or simultaneous communications to supplement the terms of the written Agreement, as executed on February 8, 2002. The City may offer evidence of communications with Figg taking place after February 8, 2002, to demonstrate the creation of a new agreement, or to demonstrate the exercise of the City's right to change the general scope of the work under the Agreement. Figg's final estimates of the cost of construction of the bridge were

negligent as a matter of law. Whether and when the City relied on those estimates, entitling the City to any refund of fees paid to Figg, remains an issue for trial.

IT IS ORDERED:

1. Defendant Figg Bridge Engineers, Inc.'s Motion for Summary Judgment (Filing No. 92) is granted in part, as follows:

> The Plaintiff City of Omaha is precluded from offering extrinsic or parol evidence of communications with Figg taking place on or before February 8, 2002, in support of the City's breach-of-contract claims;
>
> and the Motion is otherwise denied;

2. Plaintiff City of Omaha's Motion for Summary Judgment (Filing No. 106) is granted in part, as follows:

> The Court finds as a matter of law that Figg was negligent in its final calculation of estimates of the cost of construction of the pedestrian bridge;
>
> and the Motion is otherwise denied;

3. Defendant Figg Bridge Engineers, Inc.'s Motion for Continuance (Filing No. 120) is granted in part, as follows:

> The oral argument scheduled for January 26, 2009, is cancelled, and the stay of discovery ordered on October 14, 2008 (Filing No. 104) is lifted;
>
> and the Motion is otherwise denied; and

4. The parties will contact the chambers of Magistrate Judge F.A. Gossett for the scheduling of a planning conference.

DATED this 23rd day of January, 2009.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge